Good morning everyone and welcome to the Ninth Circuit. We will hear the cases in the order on the day sheet. The first case, Luis Roman Armenta Beltran v. William Barr is submitted on the briefs. The next case, United States v. Angeli Martinez Camargo is submitted on the briefs. And the first case for argument is Scott and Veronica Gillen v. White. Good morning and may it please the court. My name is Stephanie Elliott and I represent the defendant's appellants in this case. I would like to reserve three minutes of my time for rebuttal. Please watch the clock. Thank you, Your Honor. In this case, the officers, armed with a judge-issued search warrant and a list of potential threats, acted reasonably to protect their own safety and the integrity of the search when they detained Gillen in front of his home as they are authorized to do under controlling Supreme Court precedent. What do you mean in front of his home? Is that where he stayed? No, Your Honor. That is not where he stayed, but that is where the initial detention occurred. But the case isn't just about the initial detention. And what makes this case different from other cases I'm familiar with is that he was taken some distance away. Correct, Your Honor. So I think that's the fact you have to face up to. Correct, Your Honor. The detention, although it initially occurred on the premises, the officers then transported him to a nearby location. However... So what authority supported doing that? Well, Your Honor, there is no authority that precludes them from moving him. That's not the question I asked. There are multiple questions in these cases and I understand that, but I have not found an authority that supports the proposition that if you've got a search warrant, you can effectively arrest somebody and take him some distance away to a police substation. Correct, Your Honor. There is no on-point case law that says that during a summer's detention, officers are permitted to transport the suspect. However, there is also no case law precluding that, which goes directly to the clearly established prong of the qualified immunity analysis. In addition, the officers, when they detained Gillen, transported him and effected what was in essence a much less restrictive detention than those which are authorized under the controlling case law. Mueller v. Mina and later cases interpreting summers permit actually a quite restrictive detention. The use of handcuffs for the duration of a search has been uniformly approved by the courts. Well, how is that more... you act like that's an outlier in this case within that. In this case, as I understand it, Mr. Gillen was handcuffed and was transported and was within the police substation when they finally took the handcuffs off. That doesn't strike me as being a lesser intrusion. Indeed, was he arrested? No, Your Honor, he was not arrested. Because an officer thought he had an arrest warrant, but that turned out not to be true. Isn't that the case? That is the case. Could this be defended as an arrest? Were there grounds for arrest? No, there were not grounds for arrest by DPS. And Gillen was told initially by Officer White that he was under arrest due to Officer White's mistaken belief. However, he was also told later by other officers that he was not under arrest. He was only being detained for the duration of the search. Where was he told that? He was told that by Martin Bowling at the substation. At the substation. So after he had been put in handcuffs, put in a car, and driven to the substation, then he's told, oh, by the way, you're not under arrest. But you're not free to leave either. Correct. He was told that at the substation. And it's also correct that he was not free to leave. However, pursuant to Summers' detentions, the suspects are never free to leave for the duration of the search. They are always detained for the duration of the search, and they can't just decide to leave. And as to the restrictive warrant. In what sense was he not under arrest during the time between when he was told he was under arrest and then later when he was told he was not under arrest? Because he was being detained pursuant to the search warrant. Is there any way he could have known that? In that gap of time where he had been told he was arrested? In that gap of time, I don't know that there's any way that he could have known that. Or anyone who saw him in handcuffs being driven to the police station or walking into the police station. I mean, there's a public view issue here that's not there when he's at his own home. Correct. There is a public view issue. However, the detention could have occurred in its entirety. For example, in his front yard, he could have been handcuffed. He could have been guarded in his front yard by officers still on the premises. And that still would have implicated a public view situation. And as far as the restriction on his detention, he was handcuffed while he was driven to the substation approximately five minutes away. However, once there, the remainder of his detention occurred without handcuffs. He was free to move about the substation. He was free to make phone calls to his lawyer or whoever. He had access to facilities. And in that sense, it was a reasonable interpretation of Summers by these officers that they could take steps to effect a less restrictive detention than what is authorized. But that accepts your premise, it's less restrictive. I don't see anything in Summers that authorize putting somebody in handcuffs, telling them you're under arrest, and taking them some distance away. Do you see anything in Summers that really authorizes that? No, Your Honor. Those specific facts are not present in Summers. However, there is... And Summers draws some limits. Summers doesn't say, oh, by the way, it may be carte blanche beyond this point, too. It tries to confine the authority that's given, and the confinement would not open the door, it seems to me, to what happened in this case. Summers did set limits on the authority. However, in the time since Summers, courts, including this court, have analyzed situations where the facts materially differed from Summers and still analyzed whether the Summers authority would apply. And many times it did, and sometimes it didn't. We had a case in, I don't know if it's been cited by the parties here, a case in 1983, U.S. v. Taylor, which said that the detention of somebody named Pressler could not be justified, excuse me, based on Michigan v. Summers. And in that case, the individual Pressler was not taken as far away as a police substation, was taken and told to lie down in a ditch some distance from the house. The distance isn't defined. In that case, our court said that crossed the line. Summers wasn't good enough to protect that. Why is this case different? Correct, Your Honor. Well, Taylor is not binding on this court and also doesn't preclude qualified immunity for two reasons. Number one, the facts in Summers, although perhaps superficially look similar, are in fact very distinct from the facts of this case. And number two, since 1983, the Summers jurisprudence has evolved significantly, particularly as we saw in the Supreme Court's ruling in 2005 in Wheeler v. Mina, where it clarified the categorical nature of the Summers authority, but it also evolved in the evaluation of officer safety as an important factor, which was not even cited in Taylor or even recognized as a legitimate law enforcement interest under Summers. So to sort of... For officer safety, I can understand that certainly a legitimate concern. Was there any particular threat articulated by Mr. Gillen? There were a number of threats that were personal to Gillen, which, number one, necessitated DPS SWAT involvement in the first place. Well, those weren't threats he made at the time. It's not like there was a detention and then a decision, this isn't a good, safe place, he's threatening us, we have to take him someplace else. They'd made an assessment beforehand, all the SWAT team and those preparations, pretty elaborate preparations, were made because of what it was perceived that Mr. Gillen might be capable of doing. But did he articulate any threats or take any action that would have caused the officers on the scene to say, oh, we have to do something more to protect ourselves? When he, yes, he did. When he was detained, he was combative and he, with the officers, and he was noncompliant with commands. And Your Honor pointed out there... Physically combative? He was noncompliant with commands and he aggressed towards them when he was told to stay in the same place and the officers, particularly Officer White, felt like that was a threatening behavior on the part of Gillen. He was armed, right? He was armed with two weapons and had always been expected to be armed as well, which was part of the reason that the initial operation was planned so as to avoid any contact with Gillen at all, which is one major factual distinction between this case and Taylor, where it appears that the whole plan was to lure the suspects out of the house for the purpose of detaining them and then conducting a search at some later time. Here, this operation was planned to avoid contact with him. It was planned to start the moment that he left his house and Officer Boling gave the entry team the green light to head over. And so that factual difference on top of the later case law that clarified the categorical nature of this authority is what distinguishes United States v. Taylor and makes it really inapplicable to this case, both on its merits and as qualified immunity applies. So Anna talks about you don't have to worry about the quantum of proof or extent of intrusion from seizure, which I'm not quite sure what that means, but did Bailey then change that? So now we do have to worry about the quantum of proof and the extent of intrusion? No, Bailey did not change that. The court in Bailey, because the suspect's initial detention occurred a mile away from his house, the court in Bailey analyzed that as an entirely separate detention from those analyzed in Summers. In Bailey, the court said, quote, it is necessary then to discuss the reasons for the rule explained in Summers to determine if its rationale extends to a detention like the one here. So Summers clarified in Mina, the categorical authority requires only that you ask whether there's a search warrant and whether there are occupants at the time. Because in Bailey, they determined that Bailey was not an occupant being one mile away from his house. They revisited the balancing test. That does not need to be done here because the result of Mueller was that it relieved courts and officers of performing an ad hoc balancing test every time a Summers detention occurs. And by doing that, it implicitly recognizes that there are variations in the different elements of the balancing test. And so, although even if the balancing test were revisited in this case, the three law enforcement interests were served because Gillen was in front of his home at the time he was detained. He was a danger to officers at the home. He could have frustrated the search because he was at the home. And those elements separate this case from Bailey. I notice my time is running short. So if there are no further questions, I will reserve the rest of my time for rebuttal. All right. Thank you. Thank you. Good morning. May it please the court. My name is Martin Bin, along with my partner Donna McDaniel. We represent Chief Gillen in this matter. And I want to start with the stop in this case.  They were not there to execute a search warrant. They weren't part of the executing team. They were simply on scene as surveillance officers, or even in testimony, one officer said they had been deployed as a sniper team. The stop of Gillen was without probable cause, without reasonable suspicion. It was just a stop, and it was illegal. There is no justification under Summers for this stop. And when we look at Summers, it's very clear. Summers is a narrow exception, and it applies where and when a warrant is executed. And that language is consistent throughout the subsequent cases. Even Mueller v. Mina, that had to do with the search warrant, but it was for the length of time while the house was being searched. The case law is very clear about where and when we are allowed to detain folks. This is not what happened in Gillen's case. I didn't see anything in the cases that said detention starts only when you actually enter into the place being searched. The language that you pointed to, nothing turned on it. I mean, the court used some language but never specified that. Here we had an integrated operation where involving a SWAT team for surveilling, then coming in to blow off the door and go in. So I didn't see the sort of timing issue that the Supreme Court making anything of that. I think when we look at all the cases, when we look at when it begins is when the search begins as the warrant is executed. What was the logical distinction? I mean, it wasn't like the search was a surprise to the officers. They were there, they might have been the forerunners, and they were surprised when Mr. Gillen returned, and they took action based on that. Entirely, it appears, because they knew the search team was about to arrive and the mission had been to try to accomplish the search when he was not there, and suddenly he's there, so now what do we do? So I'm not sure that the notion that we should disregard the fact that a search warrant had been obtained and was about to be executed. This seems to come within a fair penumbra of that search warrant. I don't think so, Your Honor. When we're looking at this, the search warrant was not something going to be executed within the next five minutes. In fact, the officer that assisted with Gillen's detention and took him to the substation was the person with the warrant, and they waited until he was completely finished at the substation to return to the house. Really, the Summers justifications aren't even supported by holding Gillen somewhere away from the house. Here, when we look at, for example, when does this start, they didn't start this operation until 45 minutes after Gillen had been taken into custody and taken to the police station. So five minutes would be okay, but 45 minutes is too long? I think we started looking at distinctions, but no. What we have in those other cases, like Summers, is the officer with the warrant at the scene, and he's coming in to serve the warrant, and the suspect is coming down the stairs. That's one instance. We have the Taylor case. Taylor's a little different. Taylor, the officer, has generated a ruse, flushed out the suspects and stopped them before the warrant was ever served as well. And again, holding them some distance away. I'm a little bit confused by your argument. You said that the officer who had the warrant took Mr. Gillen to the police station? Yes. So doesn't that suggest that if Mr. Gillen hadn't returned home, that officer would have been there at the house earlier with the warrant? I'm a little confused about your logic on that. We have to look at the record on that. I mean, that's just the facts of what happened. Gillen was arrested, put in a car, the officer with the warrant then accompanied him to the police station. That's an interesting point. So you're saying that White or Inglis had the search warrant when they were... No, I'm sorry. It was Officer Haddad. He's not a party anymore. Well, he wasn't the one... Was he the one who took Gillen to the substation? He was in the vehicle. He's no longer a defendant. Haddad is a detective with the town of Hayden. We've settled with the town of Hayden. And Haddad was simply... With the search warrant. After Gillen had been arrested. So he had the search warrant at the residence? He was the person with the search warrant. Okay. So it was Boling, one of the... Boling is a... Was one of the SWAT team members who drove Gillen to the substation. It was Boling's vehicle. He's a DPS officer. He wasn't on the SWAT team. He was simply assigned to be there. He was the first surveillance officer on the scene. And he lost Gillen and came back and was waiting. But it seems like you're using the presence of the search warrant at the house as the start point for the search. And if that's true, it seems like it was there  No. I think if you look in the record, Gillen is arrested, searched. Reports are written that he's been arrested and searched, incident to his arrest, sitting on a curb, waiting. The officer arrives, Hayden, excuse me, Haddad arrives as they put Gillen in the car. He arrives with Gillen back to the police station. Let's assume for a moment there's a constitutional violation of what you described. What case clearly established that the premature detention, whether it's five or 45 minutes, is a constitutional violation? I think it's a Fourth Amendment violation. Well, that's not good enough. The Supreme Court has been very clear saying we can't go at a very high level. So tell me what case would clearly establish that what they did with regard to the timing of the detention was a violation. I'm not sure it's the timing specifically. It's not having the warrant present at the scene. Okay, so tell me what case would clearly establish that. I think it's all the cases, Judge. See, that's an answer that our court has given and the Supreme Court has rejected on multiple occasions. So telling me that Fourth Amendment law generically isn't going to be an answer that flies, at least not with our superiors. Here it simply is obvious, Judge. I don't think it's obvious. I really don't think the premature detention of a fairly brief period of time is a constitutional violation. So let me put the question to you this way. Point me to a case that will persuade me it's a violation, let alone make it clearly established for the officers. I will point you to Taylor as well. Taylor and Taylor. Taylor, I read more as a distance away and so forth, not so much a timing, although that was in the background too. The timing is in the background and is a component of it. They were stopped, apparently, before the arrest warrant was even served. It is part of a component. It's a slightly different analysis. But I would point to Taylor as a 30-year-old case that does support the position. How do you respond to opposing counsel's argument that that was pre-Maynard v. Mueller, which changed the landscape? Well, it is pre-Maynard. I mean, it is obviously. Did it change the landscape? The landscape needed a categorical right. It says we don't look at quantum of proof, et cetera. And, of course, the woman in that case was detained in a garage adjoining, so some distance away from where they were actually searching. They said that was fine. Right. She was detained in the garage. It wasn't of the premises. This, and Taylor was away from the premises. We don't know what distance, but certainly the way in line. But that's a different question than when do we consider this search to have started. I mean, do you have a case that says that when the officers are surveilling the house, that's not the beginning of the search, or that you need the warrant to be there to be the beginning of the search? We have what we do have, the facts and the record. And what we have is the deposition of the 30B6 witness who was the supervisor of the SWAT team, and I said, when does the search begin? When is it executed? And they said, when we arrive on the scene  we're executing a search warrant. And in our view, that's when it starts. Well, that's not clearly established law, which is where this inquiry started. That's the fact, that's when it happened in this case. That's their view, that's not a legal determination. I understand. However, when we look at the cases, I mean, I don't have a case where officers arrived and rounded someone up ahead of time and hauled them away. We simply don't have that. We have Taylor is the closest we've got. It's obvious we don't do that because that's a Fourth Amendment violation. We haven't arrived with a warrant to execute it. But the warrant existed, right? I mean, is there even a case that says the officer who is actually the first one to the door has to have the warrant in hand compared to the officer behind him or something? I think it's implicit in all the cases. If we're not executing the warrant, suddenly we're not, as in Bailey, we're constrained to where and when the warrant is executed. Well, let's take the facts of this case. They know the warrant exists. They know the warrant is coming. The mission was to accomplish the search when Mr. Gillen was not there. Mr. Gillen arrives, what do we do? If they had simply stopped him and held him at that point, knowing the warrant is on the way and the search is about to be conducted, I think that's a very different case. But it's not a very different case because the detention happens before the warrant is physically present. I think the one leap here, Judge, is that these officers who actually made the stop weren't doing it in anticipation of the search warrant. They thought they were arresting Gillen with an arrest warrant. That's what they believed, and that's what Gillen believed. This is an arrest and a seizure. But that doesn't matter for our analysis, does it? I mean, we're looking at it from an objective view. Well, if he's arrested and removed and held at a different location when the search starts 45 minutes later, I think that's problematic. I think that's a violation. I don't think Summers is a justification. Do you think that's because Officer White had the view that it was an arrest that that makes a difference? How is that argument different than your... What's different is, in the one instance, it's not officers knowing, well, we've got a search warrant, we're going to do this thing. It's an arrest, they haul Gillen away. The Summers justification evaporates at that point. He's gone 45 minutes before the where and when of the search warrant. That gets back to Judge Clifton's question about what case would inform the officers of that. I think that goes to the obviousness, Your Honors. I mean, officers don't just haul people off the street because they believe they are dangerous and then come with a warrant later. But that's not what happened here. Because we know that the search warrant was there, except for a moment that the officers were mistaken as to what kind of warrant was there, they weren't randomly seizing somebody who they thought was dangerous. They thought they were operating as part of an established planned procedure, which may have been one in which they got their fact as to what kind of warrant wrong, but was actually true with regard to the fact that an operation was going to proceed with the search and they wanted the search to take place without Mr. Gillen being present. So what case... But you're saying, I don't have a particular case. Isn't that a problem for us? I mean, even your brief says existing precedent must have placed the question beyond debate. It does. There is no case on all fours facts. We've got Taylor and we've also got Bailey, Brody, all those cases. Now, Brody, again, is from the, I think, D.C. Circuit and was a month before this case. But it's virtually on all fours. It's the where and the when is so patently obvious that you can't seize someone unless you are executing a search warrant. You are permitted to seize people without probable cause where and when you execute a warrant. If we start making these, well, we can do it 20 minutes before, an hour before, suddenly we've opened the Pandora's box and we don't have a number of cases where police officers do this. We do have the Brody case where it happened in that case. But otherwise, no. I think this is obvious, as Judge Silver found, it's an obvious violation of the law. And with that, unless we have any more questions, I think I'll sit. All right. Thank you very much. Thank you. Your Honors, I would like to quickly make two points. The first has to do with the obviousness principle, which this court addressed in Sharp v. Orange County recently, that the obviousness principle has extremely limited applicability in Fourth Amendment context where officers are encountering suspects in different factual scenarios every day. And in Sharp, both of the issues that this court dealt with particularly the issue regarding Summers was far more afield from the actual facts of Summers, yet still this court granted qualified immunity. Gillen has no clearly established precedent that can satisfy the white standard. And as this court had stated in Sharp, without that, qualified immunity is appropriate. The second issue that I want to address is the issue of timing. Although 45 minutes elapsed between Gillen's detention and the warrant, I don't know that it is not in the record that Haddad was at Gillen's home prior to the transport. I believe that he was. But in any event, the 45 minutes elapsed due to Gillen's return home. The SWAT entry team was staged five minutes away. It's only speculation how quickly they would have arrived had he not returned home. But also that time was elapsed so that the SWAT team could talk to him, allow him to help facilitate the search, assist them with their concerns for officer safety, provide his house and vehicle keys because the warrants were also for his vehicles. So the 45 minutes was in response to his return. It was really in response to him being taken to a different location. That's the piece that puzzles me the most. In particular, if they wanted to confer with him, why was he taken to a different location? The only thing that we have in the record to explain the transport is Boling's testimony that they had transported him for his convenience so he wasn't in his front yard in front of all of his neighbors and handcuffed during the search. Unfortunately, that's the only thing in the record to explain the transport. However, then his detention, I don't believe that the officers would have taken his handcuffs off had he remained at the house. So the detention at the substation did permit that to happen. But the 45 minutes didn't just elapse by virtue of the transport. It also elapsed because Haddad went and spoke with Gillen about the possibility of explosives, about the other safety concerns and asked for the keys. And once they were provided, the SWAT team revised the operational plan so as to do less damage to the property and be less dangerous overall. Thank you very much. We appreciate your arguments. In the case of Gillen, Scott and Veronica Gillen v. White is submitted.
judges: Clifton, Ikuta, Friedland